UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SHIPBUILDERS OF WISCONSIN, INC.,

        Plaintiff,

  v.                                            Case No. 11-C-250

BENT GLASS DESIGN, INC., and
PROCURVE GLASS TECHNOLOGY, LLC,

        Defendants.

---

**DECISION AND ORDER PARTIALLY GRANTING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff Shipbuilders of Wisconsin, Inc. (Shipbuilders) claims it installed laminated marine glass manufactured and sold by defendants Bent Glass Design, Inc. and Procurve Glass Technology, LLC, on three custom motor yachts that it built in 2007 and 2008. Starting in January 2009, Shipbuilders began receiving complaints from the purchasers of the yachts that the marine glass had begun to delaminate. After incurring repair and replacement costs of more than $700,000, Shipbuilders commenced this diversity action against the defendants asserting claims for: (1) breach of implied warranty of merchantability; (2) breach of implied warranty for fitness for a particular purpose; and (3) breach of the duty of good faith and fair dealing. The case is before the court on Shipbuilders' motion for partial summary judgment on its claims for breach of the defendants' implied warranties of merchantability and fitness for a particular purpose. The defendants oppose Shipbuilders' motion and have moved for summary judgment in their own right on the ground that the express warranty they gave has expired and all implied warranties were

disclaimed. Shipbuilder's motion should be denied in any event, the defendants argue, because a factual dispute exists as to the cause of the delamination. For the reasons that follow, Shipbuilders' motion for partial summary judgment will be granted but only in part.

## I. SUMMARY JUDGMENT METHODOLOGY

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322. In determining whether to grant a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This district, like most, has enacted local rules that are intended to focus both the court and the parties on the essential question in deciding any motion for summary judgment, namely, whether there are genuine disputes as to any facts that are material to the disposition of the case. Thus, the moving party is required to file along with the motion either a statement of material facts to which the parties have stipulated or a statement of proposed material facts as to which the

2

moving party contends there is no material issue and that entitle the moving party to judgment as a matter of law. Civil L. R. 56(b)(1). The statement of proposed facts is to consist of short numbered paragraphs and include within each paragraph specific references to the affidavits, declarations, or other parts of the record that support the fact set forth in that paragraph. Civil L. R. 56(b)(1)(C)(i).

The party opposing the motion must then file a response to the moving party's statement of undisputed facts which is intended to make clear which, if any, of those facts are in dispute, and to set forth any additional facts that bear on the motion. The opposing party's response must therefore reproduce each numbered paragraph of the moving party's statement of facts followed by a response to each paragraph, including when the fact is disputed, a specific reference to the affidavit, declaration, or other part of the record that supports the claim that a genuine dispute exists as to the fact stated by the moving party. Civil L. R. 56(b)(2)(B). If the opposing party believes there are additional facts that prevent entry of summary judgment, the party should include in its response to the motion a statement, consisting of short numbered paragraphs, setting forth such additional facts, including references to the affidavits, declarations or other parts of the record relied on as support. Civil L. R. 56(b)(2)(B)(ii).

The rule warns parties that the court will deem uncontroverted statements of material fact admitted for purposes of deciding the motion for summary judgment. Civil L. R. 56(b)(4). In addition, parties are instructed that assertions of fact in their memoranda or briefs are to refer to the corresponding numbered paragraph in the statement of facts, statement of additional facts, or statement of stipulated facts. Civil L. R. 56(b)(6).

3

When properly followed, the local rule governing motions for summary judgment allows the court to easily discern which facts are in dispute and, where the law permits, save both the parties and the court the time and expense of trial. When the rule is not followed, however, it makes the entire process more difficult and time-consuming. In this case, for example, the defendants failed to reference the numbered paragraphs to support the factual assertions in their brief and instead referred to various portions of the voluminous affidavits and attached exhibits buried in the record. More importantly, defendants failed to properly respond to Shipbuilders' proposed statement of facts. Rather than set forth a simple admission or denial to the fact set forth by Shipbuilders in its statement of facts, the defendants offered their own version of the same facts or interspersed their response with additional facts that were not responsive to those set forth by the plaintiff.

The overwhelming majority of defendants' responses to Shipbuilders' statement of facts are either non-responsive or argumentative. For instance, Shipbuilders stated that "Bent Glass Design, Inc. and ProCurve Glass Technology, LLC . . . fabricate and supply custom marine laminated bent and flat glass panels to the marine industry." (Pl.'s Proposed Findings of Facts (PPFOF) ¶ 2, ECF No. 34-2.) Rather than simply admit this, defendants responded as follows:

> Bent Glass, which was founded in 1988 by Steve Lerner . . ., is a leading supplier of custom bent glass to the marine, architectural and specialty industries, and is a single source for bent, bent laminated, and insulated glasses. . . . ProCurve, a sister company to Bent Glass, is a leading supplier of custom bent glass to the marine industry that complies with industry standards. ProCurve is a single source for bent, bent laminated, and bent insulated glasses.

(Defs.' Resp. to PPFOF ¶ 2, ECF No. 38.) Where one word—"admit"—would have been more than sufficient, defendants embarked upon a narrative response that was in substance an admission.

4

Shipbuilders, in its next statement, states that "Defendants are merchants with respect to marine laminated glass." (PPFOF ¶ 3.) In response, defendants refer the court to the narrative quoted above. Again a simple "admit" would have sufficed.

Shipbuilders also proffered the fact that "The Marine Glass purchase documents do not contain the terms "merchantability" or "fitness for a particular purpose." (*Id.* ¶ 5.) Defendants respond "Since the inception of the business relationship in 2003 between Plaintiff and Defendants, including the 2007 and 2008 period that is the subject of this action, it has been the recognized practice of Defendants to disclaim all implied warranties of merchantability and of fitness for a particular purpose." (Defs.' Resp. to PPFOF ¶ 5.) There are several problems with defendants' response. First, there is a notable absence in the response whether this is an admission or a denial. Second, it is completely non-responsive to the simple factual question: do the purchase documents contain the words "merchantability" or "fitness for a particular purpose"? Third, defendants' response is argumentative insofar as they contend they waived warranties through past practices.

The court will not further outline the issues in each defendants' response. Suffice it to say that defendants' responses are, when viewed as a whole, non-responsive, evasive, argumentative, or constructive admissions. That defendants filed a separate statement of additional facts in support of its own motion for summary judgment is of no moment. *See Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000). This is just the type of response that wastes valuable time and resources that could instead be focused on the key issues in dispute. Rather than admit the purchase documents do not contain these terms, defendants' response necessitates that the court search the record for the documents and confirm for itself that indeed there is no material dispute that the documents in fact do not contain the noted terms. As a result

5

of the defendants' blatant disregard of the local rules governing summary judgment, their response to the plaintiff's 16-page statement of facts is 42 pages long. This only adds to the time needed to determine what facts are actually in dispute. The defendants' failure to comply with such a simple rule suggests either carelessness or a fear that a direct response will harm their interests. To say the least, a smoke and mirrors strategy is not a persuasive method to defeat summary judgment.

The Seventh Circuit has repeatedly made clear that a "district court is not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'" *Smith v. Lamz*, 321 F.3d 680, 638 (7th Cir. 2003) (quoting *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000)); *see also Bey v. Cook County*, No. 10 C 6902, 2012 WL 5995732, *1 n.1 (N.D. Ill. Nov. 28, 2012) (striking plaintiff's response statement of facts on ground that many responses improperly included extraneous and additional information after stating whether the defendant's proffered fact was disputed or undisputed). Aside from a few minor instances, defendants neglected to either deny or affirm Plaintiff's proffered facts, instead opting to offer narrative responses, like those described above, that often contained extraneous information or defendants' own legal arguments. Defendants' responses to Plaintiff's statement of facts are substantially noncompliant with Civil L.R. 56(2)(B). Consequently, the court will deem the plaintiff's statement of facts admitted for purposes of summary judgment, except where a proper response has been provided.

## II. UNCONTROVERTED FACTS

Shipbuilders, a Wisconsin corporation located in Manitowoc, Wisconsin, specializes in building high-quality custom yachts for its customers. Defendants Bent Glass and ProCurve fabricate and supply custom marine laminated bent and flat glass panels to the marine industry.

The defendants are merchants with respect to marine laminated glass. In 2007 and 2008, the defendants sold to Shipbuilders marine laminated glass to be used in the construction of three yachts, Hulls 503, 505, and 506, which are the subject of this action. The defendants understood that each of the vessels containing the marine glass would require custom sizing, bending, and fabrication to match each vessel's unique design. The marine glass purchase documents do not contain the terms "merchantability" or "fitness for a particular purpose." (PPFOF ¶¶ 1-6.)

The process of installing laminated glass into ships and yachts is called "direct glazing." Direct glazing consists of two steps: (1) bonding, which uses a caulk product called an adhesive to bond the glass to the structure of the vessel; and (2) sealing, also called backfilling or tipout, which uses a caulk product called a sealant to fill the void between the glass and the frame holding it. (PPFOF ¶¶ 24-25.)

The industry standards for the shipbuilding industry are set by the American Bureau of Shipping (ABS). Shipbuilders are required to meet ABS standards in order receive an ABS classification. The defendants understood that the vessels for which Shipbuilders purchased the marine glass were required to receive ABS classification. As part of its classification, ABS approves installation materials for laminated marine glass. At the time the marine glass was installed, ABS approved the use of Sikaflex 296 adhesive manufactured by Sika Corporation, and defendants understood that Sikaflex 296 adhesive would be used for bonding on the installation. ABS also requires that installation be performed according to the recommendations of the caulk manufacturer. The Sika Marine Direct Glazing Guide is Sika's installation protocol for marine glass and is considered the standard marine industry practice. Sika's Glazing Guide also lists Sikaflex 295 UV as one of several sealants that can be used. (PPFOF ¶¶ 26-35, 48.)

7

Shipbuilders contracted with Keith Startz of All Around Glass to perform the installation of the marine glass on the three vessels. Startz, who had over ten years experience installing marine glass and had completed Sika's training on its Installation Guide, used Sika 296 adhesive for bonding and Sikaflex 295 UV as a sealant. Both during installation and upon completion, Shipbuilder's quality control personnel and the respective vessel captains approved Startz's installation workmanship. (PPFOF ¶¶ 36-49.)

Beginning in early 2009, the marine glass installed in each of the three vessels experienced substantial delamination. Delamination is a breakdown or failure of the adhesion between the layers of laminated glass. Delamination is a visual defect that interferes with the use and enjoyment of the product. It can be caused by certain errors in the laminated glass fabrication process. Among the errors in the fabrication process that can cause delamination are: insufficient quality control; inadequate process control; climate control errors; improper storage or handling of interlayer material before fabrication; use of glass which contains inherent surface contaminants before autoclaving; use of interlayer with inherent imperfections that cause adhesive breakdown between interlayer and glass; and use of interlayer containing materials incompatible with other interlayer components. (PPFOF ¶¶ 8-14.)

All of the delamination of the marine glass occurred within the frit area of the glass. The frit area is the black perimeter located around the edge of the marine glass. Substantial delamination originated in the center of the frit area and slowly migrated out to the edges of the frit. There was no uniform or even fairly uniform delamination that began along the outside edge of the frit. (PPFOF ¶¶ 14-17.)

Shipbuilders later learned that the defendants used Sika Primer 206 G+P, which is also manufactured by Sika Corporation, for the frit material on the marine glass. They used Sika Primer 206 G+P as a primary ultraviolet light barrier to provide ultraviolet light resistance. Sika has never approved Sika Primer 206 G+P for use as a frit material or primary ultraviolet barrier. In fact, upon learning that the defendants were using it for this purpose, Sika notified the defendants that Sika Primer 206 G+P was not approved as a frit material. (PPFOF ¶¶18-20.) In a November 3, 2008 letter confirming an earlier telephone call, Stephen Padgett, Sika's Technical Coordinator, advised Steve Lerner, the defendants' founder and president, that not only was Sika Primer 206 G+P not designed for direct glazing applications, but that it could not withstand the temperatures used for laminating glass:

> As discussed with Mr. Segal, Sika Primer 206 G+P was not designed for, not intended to be used as a primary long term blackout coating for any direct glazing applications. Furthermore, the baking conditions associated [with] the glass lamination process exposes the Sika Primer 206 G+P product to temperatures that are well beyond its typical limitations.

(PPFOF ¶ 21; Aff. of George A. LaMarca, Ex. 20, ECF No. 34-6, at 9.) Sika confirmed this advice to the defendants in a February 5, 2009 email, and the advice is also consistent with the Product Data Sheet for Sika Primer 206 G+P. (PPFOF ¶¶ 22-23.)

At the same time that the marine glass that is the subject of this dispute delaminated, there were nine other shipyards that purchased marine glass from the defendants that also experienced delamination problems like Shipbuilders. The defendants used Sika Primer 206 G+P as the frit material for the marine glass they sold to these shipyards as well. Furthermore the glass delaminated regardless of variations in the installers and the type of bonding and sealant materials used during installation. (PPFOF ¶¶ 61-63.) After the marine glass purchased from the defendants

9

delaminated, Shipbuilders contracted with a German manufacturer named Yachtglass for marine glass which was installed on two yachts using the same materials and process used to install the glass manufactured by the defendants. None of the glass on these two vessels has delaminated.

## ANALYSIS

**A. Defendants Did Not Disclaim Implied Warranties.**

Under Wisconsin law, which the parties concede governs the case, "[u]nless excluded or modified . . ., a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Wis. Stat. § 402.314(1). To be merchantable, goods must, among other things, "[p]ass without objection in the trade under the contract description," and be "fit for the ordinary purposes for which such goods are used." Wis. Stat. § 402.314(2)(a) and (c). Wisconsin law also provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose.

Wis. Stat. § 402.315. Both implied warranties can be excluded or modified either expressly or "by course of dealing or course of performance." *Id.* § 402.316(2)-(3). The defendants contend that both warranties were in fact disclaimed.

In order to disclaim "an implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous." *Id.* § 402.316(2). To disclaim an implied warranty of fitness, "the exclusion must be by a writing and conspicuous." *Id.* The language excluding an implied warranty of fitness will be deemed sufficient "if it states,

10

for example, that 'There are no warranties which extend beyond the description on the face hereof.'" *Id.*

Shipbuilders points out that none of the purchase documents for the marine glass that was installed on the three yachts that are the subject of this action contain any disclaimers of the implied warranties of merchantability or fitness. (PPFOF ¶¶ 4-5.) Although the defendants' price quotations for the marine glass limit an express warranty, there is no mention of implied warranties or reference to extrinsic terms and conditions. (LaMarca Aff., Ex. 8, ECF No. 34-4.) Likewise, the defendants' Order Acknowledgments do not mention implied warranties or direct the purchaser to extrinsic terms and conditions. (LaMarca Aff., Exs. 4 & 6, ECF No. 34-4.)

In response to Shipbuilder's argument that there was no disclaimer of implied warranties, the defendants offer the conclusory statement of Steve Lerner that "since the inception of the relationship between Plaintiff and Defendants, there has always been agreement that Defendants provide marine glass to plaintiff based on a 'limited warranty' and does not cover any other express or implied warranties.'" (Defs.'Opp. Br. 8.) The evidence cited, however, does not support such a claim. Exhibit F, which the defendants cite as support for the foregoing statement, consists of a September 2003 email train concerning a request for an extension of the defendants' express warranty for two unrelated yachts, Hulls 497 and 498, by Shipbuilders' then-Director of Purchasing and Warehousing. Exhibit G, also cited by the defendants, is an unsigned September 2003 letter from Mr. Lerner addressed to the same Director of Purchasing and Warehousing that addresses the same question concerning the same Hulls. The letter does include a disclaimer of implied warranties of merchantability and fitness for a particular purpose, but Shipbuilders has no record of having received it. Even if Shipbuilders had received it, it would not change the result. Neither

11

exhibit can reasonably be held to have disclaimed implied warranties arising out of sales that occurred some four years later.

The defendants also reference two other documents entitled "Limited Product Warranty for Laminated Flat and Bent Glass" and "Terms and Conditions of Sale ("Terms")" as further evidence of their disclaimer of implied warranties arising from the 2007-08 sales. (Dermesropian Aff. Exs. H & I, ECF Nos. 40-8, 40-9.) But as noted above, neither document is referenced in the sales documents relating to the case, and the defendants offer no evidence that Shipbuilders was ever provided a copy of them. Mr. Lerner states in his affidavit that "it is common practice for Bent Glass and ProCurve to provide marine glass to customers, similar to Shipbuilders, based on a 'limited warranty' that does not cover any other express or implied warranties." (Steve Lerner Aff. ¶ 62, ECF No. 37.) He states that "[a]ll implied warranties of merchantability and fitness for a particular purpose are always disclaimed." (*Id.* at ¶ 63.) He also states that his companies "*issued*" a "Limited Product Warranty for Laminated Flat and Bent Glass" that included a disclaimer of limited warranties and that they also "*issued* Terms and Conditions of Sale" that also included such disclaimers. (*Id.* at ¶¶ 64-65 (emphasis added).) Lerner does not state, however, that the defendants issued the Limited Product Warranty or Terms and Conditions to Shipbuilders. In fact, nowhere in the record is there a statement by Lerner or any other employee of the defendants that Shipbuilders was ever provided a copy or given notice of these documents.

The defendants' response is insufficient to create an issue of fact over whether it disclaimed implied warranties of merchantability and fitness for a particular purpose. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact."). None of

12

the purchase documents for the marine glass contained the terms "merchantability" or "fitness for a particular purpose." (PPFOF ¶ 5.) The defendants have produced no document that it provided Shipbuilders that would have given them notice that implied warranties were disclaimed. And while the defendants may have disclaimed implied warranties in connection with a separate transaction that occurred four years earlier than the sale at issue here, one previous transaction is not enough to prove disclaimer by a course of dealing or performance. *See Novelly Oil Co. v. Mathy Const. Co.*, 147 Wis.2d 613, 618 n.*, 433 N.W.2d 628, 630 (Ct. App. 1988) ("[T]he code itself defines "course of performance" as 'involv[ing] *repeated* occasions for performance.' Sec. 402.208(1), Stats. (emphasis added). '[I]t necessarily follows that there is no course of performance when there are merely intermittent casual, or isolated . . . performances. A single incident . . . does not constitute a course of dealings or performance.'" (quoting 2 Anderson, Uniform Commercial Code sec. 2-208:5, at 309 (1982))); *see also Maritime-Ontario Freight Lines, Ltd. v. STI Holdings, Inc.*, 481 F. Supp. 2d 963, 971 (W.D. Wis. 2007) (noting that a single occasion of conduct does not constitute a course of dealing).

It therefore follows that the defendants did not effectively disclaim the implied warranties of merchantability and fitness for a particular purpose. The next issue is whether the undisputed facts establish that either or both warranties were breached.

**B. Whether Defendants Breached the Implied Warranties Is A Disputed Issue of Fact**

In order for goods to be merchantable, the goods must, among several requirements, (1) pass without objection in the trade under the contract description, (2) be of fair average quality within the description, and (3) be fit for the ordinary purposes for which such goods are used. Wis. Stat. § 402.314(a)-(c). Shipbuilders argues that the marine glass was defective when it was

fabricated by defendants and thus was not merchantable. Generally, "[a] product that fails to accomplish its ordinary purpose when used in accordance with the merchant's instructions is not merchantable." *Manitowoc Marine Group, LLC v. Ameron Int'l Corp.*, 424 F. Supp. 2d 1119, 1131 (E.D. Wis. 2006), *vacated on other grounds*, 2006 WL 1799821 (E.D. Wis. Jun. 28, 2006).

Shipbuilders asserts that the marine glass was not merchantable because the glass delaminated though Startz installed the glass following the ABS classification and Marine Direct Glazing Guide standards. For the marine glass to be considered merchantable, it should not have delaminated when installed properly. There is no contention that Shipbuilders' use of the marine glass was somehow unique and not customary. *See* U.C.C. § 2-314 cmt. 2 ("[T]he ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to the uses which are customarily made of the goods in question."); *cf. Jay Dee Contractors, Inc. v. Tews Company, Inc.*, 787 F. Supp. 160, 164 (E.D. Wis. 1992) (holding that plaintiff's application of "weak concrete" was unique, precluding breach of an implied warranty of merchantability).

Shipbuilders also contends that defendants breached its implied warranty of fitness for a particular purpose because defendants held themselves out as having skill and judgment in fabricating laminated glass and Shipbuilders relied on that skill and judgment. "[F]or there to be an implied warranty of fitness for a particular purpose, '[t]he buyer, of course must actually be relying on the seller.'" *Id.* (quoting U.C.C. § 2-315 cmt. 1). Shipbuilders argues that it relied on defendants to choose an appropriate laminate material that would be compatible with the Sika products that defendants knew Startz would use during installation.

At the outset, it must be noted that Shipbuilders bears the burden of proof at trial on the issue of whether the warranties were breached by the defendants. There is no dispute that the glass

14

delaminated, thereby creating a defect. The key issue here is what caused the glass to delaminate: was it a defect in installation attributable to Startz or a defect in fabrication attributable to defendants?

Shipbuilders offers what appears to a layperson to be substantial evidence that the delamination of the marine glass it purchased from the defendants was due to defects in the manufacturing process and not the result of improper installation. The fact that the defendants used Sika Primer 206 G+P as the frit material, a product that Sika itself states is not suited for such a purpose and that cannot withstand the temperatures needed for the lamination process, certainly suggests that the defect was in the manufacturing process. This is especially true given the fact that nine other shipyards that purchased marine glass manufactured by the defendants using Sika Primer 206 G+P also experienced delamination problems like Shipbuilders, despite variations in the installers and the type of bonding and sealant materials used during installation. That the delamination originated within the frit area itself, and not at the edges where one would expect it to originate if the delamination were due to water infiltration or chemical reaction with the adhesive or sealant used by the installer, would also seem to be strong evidence of a manufacturing defect.

Defendants urge that there remain genuine issues of material fact for trial concerning causation for several reasons. They argue that the delamination of the marine glass windows on Hull Nos. 503, 505, and 506 was likely the result of one, or a combination of the following causes: (a) a defect in Sika Corporation's products causing the delamination; (b) improper installation by Startz causing toe bead to fail; (c) migration of plasticizers from Sika Corporation's caulk into glass interlayers; (d) defects in watertightness caused by improper handling and/or installation; and (e) use of incompatible sealant material. (ECF No. 35, at 7.) The defendants cite laboratory reports

15

and test results, none of which, they contend, concluded that the cause of the delamination was a manufacturing defect." (ECF No. 35, at 4.)

As Shipbuilders points out, however, none of the alleged laboratory reports and test results describe tests or experiments that were performed on the materials at issue here, nor were any conclusive in determining what the cause of the delamination was. The defendants note for example that a firm called Polymer Diagnostics, Inc. (PDI), issued a report that showed that plasticizers from the caulks used in installation can migrate into the Polyurethane interlayer and could in part be related to the delamination problem. But the marine glass here doesn't have a polyurethane interlayer; it has a ionoplast interlayer, which has a completely different chemical make-up. PDI itself stated the report wasn't intended for "legal purposes" and offered to perform testing that would satisfy legal standards if Lerner requested. He apparently did not request it. It also appears at least disingenuous for the defendants to claim that the experiments or testing, such as it was, was done independently or with a rigor required for admission at trial. Email correspondence reveals that Lerner was directing the testing done by the supposedly independent laboratories, none of which has been offered as an expert report. Upon consideration of their response, there appears to be some truth to Shipbuilders contention that the defendants have offered little more than diversion, distortion and denial.

Still, as the defendants point out, Shipbuilders has offered "no laboratory report or test result that concludes that the delamination of the laminated marine glass that is [the] subject of this action is caused by a manufacturing defect of said glass . . . ." (ECF No. 35, at 8.) In essence, Shipbuilders is requesting that the court draw the inferences from the evidence it offers and find as a matter of law that the defendants breached the implied warranties of merchantability and

16

fitness for a particular purpose. As noted above, it is Shipbuilder's burden to prove that the delamination was the result of a defect in the marine glass and not due to improper installation or some other cause. The defendants note that Shipbuilders has not had similar problems with a fourth yacht on which it installed glass purchased from the defendants at or about the same time, and it is not entirely clear whether Startz' use of Sikaflex 295 UV was consistent with the Glazing Manual Startz was required to follow. The defendants also contend, for example, that there was evidence of a failed toe bead which Shipbuilders concedes is indicative of an installation defect. (ECF No. 38, Resp. to PPFOF ¶ 52; Dermesropian Aff., ECF No. 40, Ex. AA.)

Given the fact that Shipbuilders has the burden of proof and the defendants have offered other possible causes of the delamination, summary judgment on this issue would not be proper. Shipbuilders is correct in its contention that "Defendants have not shown that the Marine Glass delamination was *not* the result of Defendants' fabrication process, nor have they shown that Shipbuilders' installation method violated industry standards." (Reply, ECF No. 41-1, at 2.) But the question is not whether the defendants have disproved other possible causes of the failure; when, as here, it is the plaintiff who has the burden of proof at trial who seeks summary judgment, the question is whether he has conclusively shown that the problem lies with the defendants. It is for the jury or other finder of fact to determine the credibility of witnesses and the weight to be awarded the evidence. *See* Wis. JI-Civil No. 215, CREDIBILITY OF WITNESSES; WEIGHT OF EVIDENCE. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986)(explaining that a court may not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter). The record here is not so clear as to allow the court to make such a

determination in this case as a matter of law. Accordingly, as to this issue summary judgment is denied.

**CONCLUSION**

For the foregoing reasons, Shipbuilders motion for summary judgment (ECF No. 34) is **granted** on the issue of whether the defendants disclaimed the implied warranties of merchantability and fitness for a particular purpose. The motion is **denied** on the issue of whether the defendants breached said warranties. The defendants' cross motion for summary judgment (ECF No. 36) is **denied**. The Clerk is directed to set this matter on the Court's calendar for a Rule 16 conference to discuss further scheduling. The parties may appear by telephone.

**SO ORDERED** this 18th day of June, 2013.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court